SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.
OPINION
CHIEF JUSTICE SAYLOR
*562 Before the Court are numerous petitions for review challenging the public release of Report 1 of the 40th Statewide Investigating Grand Jury, insofar as the report discloses findings of criminal and/or morally reprehensible conduct on the part of named petitioner-appellants. These individuals contend that the grand jury's findings are not supported by a preponderance of the evidence and are false or misleading. Additionally, it is their position that they were denied due process of law, and that the release of the findings to the public -- under the authority of a state-sanctioned, judicially approved grand jury -- would impair their reputations in violation of their fundamental constitutional rights.
As the litigation has progressed, this Court has found it necessary to take *563 measures to protect the identities of the petitioner-appellants, at least until their constitutional challenges have been finally resolved. Accordingly, we have issued a series of orders that reflect our intentions in this regard.
The controversy remains at an interim stage. Presently, however, the Court has determined that large portions of the grand jury's report can be released to the public, without compromising the petitioner-appellants' constitutional rights, as long as sufficient measures are taken to continue to protect their identities during the remaining process of judicial review. Accordingly, in the Order attendant to this opinion, set forth at Part VIII, we have provided that an interim version of the grand jury report will be released, containing temporary redactions solely to protect the identities of those who have lodged challenges before us, pending further order of this Court.
In the process of determining that an interim report should be released, the Court has considered and resolved several interrelated issues presented in common legal arguments advanced by the petitioner-appellants across the appeals pending at most of the above dockets. Our intent is to facilitate the publication -- as expeditiously as possible -- of as full a final report as may be released consistent with the protection of the petitioner-appellants' fundamental rights secured by the Pennsylvania Constitution.
I. Background
The 40th Statewide Investigating Grand Jury was convened in 2016 under the Investigating Grand Jury Act.[1] The Pennsylvania Attorney General initiated confidential grand jury proceedings to investigate allegations of child sexual abuse by individuals associated with six of the eight Pennsylvania dioceses of the Roman Catholic Church, failure to make mandatory reports, acts endangering the welfare of children, and obstruction of justice by Church officials, community leaders, and/or public officials. See, e.g. , In re 40th Statewide Investigating Grand Jury , No. 571 M.D. 2016, slip op. at 9 (C.P. Allegheny June 5, 2018). As required by the Pennsylvania General Assembly, these proceedings were conducted under the umbrella of secrecy pertaining to investigating grand juries, subject to the discretion of the supervising judge to permit the public release of information. See 42 Pa.C.S. § 4549(b).
Prior to the expiration of its term, the 40th Statewide Investigating Grand Jury submitted a report of the above investigation to its supervising judge, the Honorable Norman A. Krumenacker, III. See 42 Pa.C.S. § 4552. Significantly, the report is not generally couched in conventional "investigatory" terms, such as by allusion to the character and quality of the evidence reviewed according to the application of a probable cause standard. Rather, the introductory passages of the report pronounce that the grand jury will identify over three hundred "predator priests" by name and describe their conduct in terms of "what they did -- both the sex offenders and those who concealed them[,] ... shin[ing] a light on their conduct, because that is what the victims deserve." Report 1, at 2. The balance of the report extensively furnishes detailed elaborations condemning the conduct of the alleged predators and those within the Church hierarchy who may *564 have facilitated the abuses and/or failed to intervene.[2]
It is important to observe, early on, that the manner in which the grand jury approached its report -- i.e., finding facts and declaring that named individuals actually perpetrated abhorrent acts -- is central to the legal assessment of the many constitutional challenges to the public release of the report, as discussed at length in Parts II and III, below. In this regard, targeted condemnation of named individuals is not inherent in the production of a grand jury report, although reports sometimes have been used in this fashion, and plainly the grand jurors believed that it was essential to do so here. Nevertheless, grand jury reports of this sort foster the most substantial controversies, because they amplify the tension between the grand jury's reporting function and the constitutional rights of the individuals who are impugned in the report. See, e.g. , Petition of Davis, 257 So.2d 884, 887 (Miss. 1972) (depicting a critical grand jury report as subjecting an individual to "a quasi official accusation of misconduct resulting from secret ex parte proceedings in which there is no opportunity available for presenting a formal defense"); see also infra Part II.
The grand jury report in issue is denominated "Report 1," and its submission triggered a statutory procedure for review and publication. By law, the supervising judge was required to examine the report and the confidential record of the proceedings and to issue an order accepting and filing the report as a matter of public record "only if the report is based upon facts received in the course of an investigation authorized by [the Investigating Grand Jury Act] and is supported by the preponderance of the evidence. " 42 Pa.C.S. § 4552(b) (emphasis added).
Additionally, the statutory scheme allocates discretion to the supervising judge to permit the submission of written responses by individuals who are not indicted, but about whom a report is critical. See id. § 4552(e). Again, in the discretion of the supervising judge, such responses may be attached to the report and also released publicly. See id.
The supervising judge proceeded to accept the grand jury's Report 1, while specifically opining that it was supported by a preponderance of the evidence. See Order dated Apr. 27, 2018, and Amended Order dated May 22, 2018, in In re 40th Statewide Investigating Grand Jury, No. 571 M.D. 2016 (C.P. Allegheny). The predicate orders, however, contained no explanation of the manner by which the judge reached his preponderance determination, no account concerning whether that pronouncement was focused on the report as a whole or encompassed an assessment of the facts related to each individual named in the report,[3] and no discussion of the evidence considered. These orders nonetheless served as a clear signal that the judge intended for Report 1 to be filed publicly.
*565 Further, given that the report censured the conduct of individuals who were not charged with crimes, the supervising judge elected to permit living individuals who were named or implicated to submit responses to the material findings of the report. See Amended Order dated May 22, 2018, in In re 40th Statewide Investigating Grand Jury, No. 571 M.D. 2016 (citing 42 Pa.C.S. § 4552(e) ). The judge then devised a procedure to afford notice to these individuals, allowing them thirty days to respond.
Dozens of individuals (primarily members of the clergy) responded with challenges to Report 1, generally asserting a denial of constitutional rights. Although the claims differed in particulars to some degree, they shared certain key features. Most of the petitioners alleged that they are named or identified in Report 1 in a way that unconstitutionally infringes on their right to reputation. See PA. CONST. art. I, § 1 ("All men are born equally free and independent, and have certain inherent and indefeasible rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing and protecting property and reputation, and of pursuing their own happiness." (emphasis added) ); see also id. § 11. They also claimed that they were denied due process of law based upon the lack of an opportunity to be heard by the grand jury itself or in a pre-deprivation hearing before the supervising judge. See U.S. CONST . amend. XIV (precluding the states from depriving "any person of life, liberty, or property, without due process of law"); see also PA. CONST . art. I, §§ 1, 11. See generally Mathews v. Eldridge, 424 U.S. 319, 333, 96 S.Ct. 893, 902, 47 L.Ed.2d 18 (1976) ("The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.' " (quoting Armstrong v. Manzo, 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965) ) ). Many of the petitioners asserted that they were not aware of, and/or not permitted to appear at, the proceedings before the grand jury.
Several of the petitioners offered that due process could be satisfied if the supervising judge would conduct pre-deprivation evidentiary hearings to permit their meaningful participation in such an alternative forum. They asked the judge to consider excising information about them from the grand jury report that they could demonstrate was unsupported, false, and/or misleading, while leaving the vast bulk of the report available for review by the public. The supervising judge, however, found "no provision in the laws or Constitution of the Commonwealth that permits the redaction of a Grand Jury report, the findings of which are supported by the preponderance of the evidence, after it has been submitted to and accepted by the supervising judge." Order of May 31, 2018, in In re 40th Statewide Investigating Grand Jury, No. 571 M.D. 2016. According to the judge, the petitioners had received all of the process that was due them under the law. See id.
The supervising judge's treatment, in these regards, was further developed in an opinion and order of June 5, 2018, which was made available to the public. See In re 40th Statewide Investigating Grand Jury, No. 571 M.D. 2016, slip op. at 9 (C.P. Allegheny June 5, 2018) [hereinafter, "June 5 Opinion, at ___"]. In that opinion, the judge framed the legal issue as "whether a named nonindicted person in a grand jury report is, prior to the public release of the report, entitled by virtue of due process to have a full pre-deprivation hearing, including the right to cross-examine Commonwealth witnesses, present witnesses of their own, and present evidence." Id. at 1.
*566 Initially, the supervising judge found that the petitioners' concern with grand jury condemnation was sufficient, constitutionally, to implicate a requirement of procedural due process. See id. at 2 (citing R. v. DPW, 535 Pa. 440, 454, 636 A.2d 142, 149 (1994) ). In this regard, the judge recognized that protection of one's reputation is a fundamental right under the Pennsylvania Constitution. See PA. CONST. art. I, § 1 ; see also R. v. DPW, 535 Pa. at 454, 636 A.2d at 149. Accordingly, his remaining analysis centered on the question of what particular process was due to the petitioners.
Consistent with the longstanding jurisprudence of the Supreme Court of the United States and this Court, the supervising judge set forth the framework for procedural due process, as recently related in Bundy v. Wetzel, --- Pa. ----, 184 A.3d 551 (2018), centered upon Mathews, 424 U.S. at 333, 96 S.Ct. at 902. First, he observed that the concept of due process is a flexible one, and that the procedures that it requires will vary according to the particular situation. See Zinermon v. Burch, 494 U.S. 113, 127, 110 S.Ct. 975, 984, 108 L.Ed.2d 100 (1990). Furthermore, he related, ascertainment of what process is due requires a balancing of the following three factors:
(1) the private interest affected by the governmental action;
(2) the risk of an erroneous deprivation together with the value of additional or substitute safeguards; and
(3) the state interest involved, including the administrative burden the additional or substitute procedural requirements would impose on the state.
Bundy, --- Pa. at ----, 184 A.3d at 557 (citing Mathews, 424 U.S. at 335, 96 S.Ct. at 903 ).
The supervising judge also depicted the central demands of due process in the conventional terms of notice and a meaningful opportunity to be heard in furtherance of the protection of the underlying right (here, reputation). See June 5 Opinion, at 2 (citing, indirectly, Mathews, 424 U.S. at 333, 96 S.Ct. at 902 ). The judge elaborated that the Supreme Court of the United States has described due process as an "elusive concept" with "exact boundaries [that] are undefinable." Hannah v. Larche, 363 U.S. 420, 442, 80 S.Ct. 1502, 1514, 4 L.Ed.2d 1307 (1960).
Prominent among the circumstances that the supervising judge considered material was his depiction of an investigating grand jury issuing a report as solely an investigative -- and not an adjudicative -- body. See June 5 Opinion, at 4. Relying on Hannah , 363 U.S. at 420, 80 S.Ct. at 1502 (upholding procedural rules of the federal Commission on Civil Rights providing that the identity of complainants need not be disclosed and withholding any right of cross-examination from witnesses before the Commission, relative to other witnesses), the judge reasoned that lesser due process protections are generally implicated in relation to governmental investigatory functions. In the supervising judge's judgment, the statutory procedures allowing for notice to named (but uncharged) persons, and providing an opportunity to respond in writing prior to public release, were sufficient to support the issuance of an investigating grand jury report. See June 5 Opinion, at 4 (citing 42 Pa.C.S. § 4552(e) ).[4]
*567 In terms of the Mathews factors, again, the supervising judge recognized the fundamental nature of the reputational interests at stake. See id. at 5. He found the risk of an erroneous deprivation to be minimal, nonetheless, in light of the statutory requirement for supervising judges to determine that the findings of the grand jurors are supported by a preponderance of the evidence. See id. In this regard, the supervising judge explained, in broad strokes, that "the grand jury, in reaching its findings, heard from dozens of witnesses, examined numerous exhibits, and reviewed over half a million pages of internal diocesan documents from the archives of various Dioceses." Id.[5]
As to the administrative burden, the supervising judge suggested that providing any greater procedural protections would be unduly disruptive of the "purely investigative function" of the grand jury. Id. at 6 ("[P]ermitting persons named in grand jury reports to present evidence, including potentially their own testimony subject to cross-examination, to the grand jury would turn an investigative proceeding into an adjudicative one which is not the purpose or function of an investigative grand jury."). The supervising judge further opined that "[a]dopting the position advanced by the movants would fundamentally change the Grand Jury Act's procedures, change the historical function of grand juries, and effectively bring the grand jury process to a halt turning each investigation into a full adjudication." Id. at 6-7.
The supervising judge also offered his reasoning for rejecting the proposal for a pre-deprivation hearing before him. According to the judge, this would impose too great a burden on the Commonwealth, which "would be required to allow [the petitioners] access to the testimony of witnesses traditionally shielded in grand jury secrecy, permit them to recall and cross-examine those witnesses, and allow the presentation of new evidence." Id. at 7. Moreover, it was clear that the supervising judge did not believe that he had the authority to personally conduct hearings in any event, since it was the function of the grand jury "to weigh the evidence and make factual findings." Id. at 8.
The supervising judge certified his orders as to most of the challenges for immediate appeal, in recognition of the existence of controlling questions of law over which there are substantial grounds for a difference of opinion. See 42 Pa.C.S. § 702(b) ; Pa.R.A.P. 3331 (a)(5) (facilitating review of grand jury orders upon certification by a supervising judge). Despite this certification, however, the supervising judge did not temporarily halt the release of Report 1. Rather, the judge indicated that the report would be published as early as June 23, 2018.
Affected individuals filed multiple petitions for review in this Court, along with emergency applications to stay the public release of Report 1 pending the Court's review. Initially, the Commonwealth did not oppose a brief stay.
On June 20, 2018, this Court entered an order granting the requested, unopposed stay, and we issued a supportive per curiam opinion on June 25, 2018. We explained that the June 23 release date provided *568 inadequate time for orderly judicial review; the appellate-level proceedings were incomplete and adequate development was necessary; this Court did not have essential information, including Report 1 itself; and the Commonwealth had confirmed the appropriateness of a stay in some cases and indicated that it had no objection to a brief stay in others.
In most of the cases that are the subject of this opinion, clergy-petitioners (referred to hereinafter as "Appellants") have filed a single brief addressing common issues, as well as supplemental briefs addressing individualized matters. The Commonwealth, in turn, has responded to the common issues in a unified fashion. Redacted versions of the litigants' briefs are being made available to the public, following resolution of disputes as to the redactions.
In the interim, the Commonwealth filed motions to lift the stay and to unseal the record of the proceedings before this Court in all pending appeals.[6] In those filings and elsewhere, the Commonwealth has made it clear that it considers it to be a matter of great public importance for Report 1 to be released to the public immediately. News organizations (the "Media Intervenors") have presented submissions consistent with the Commonwealth's view concerning immediate publication. Alternatively, the Media Intervenors seek release of a redacted version of the report during the pendency of the litigation, which removes only information identifying the limited range of individuals who have filed appellate challenges. Appellants have opposed relief from the stay pending final resolution of their challenges, asserting that the common goal of all parties should be the ultimate publication of a report that is fair and accurate.
We address the legal arguments presented on a plenary basis. See, e.g. , Six L's Packing Co. v. WCAB (Williamson) , 615 Pa. 615, 629, 44 A.3d 1148, 1157 (2012).
II. Grand Jury Reports
We begin our analysis with a discussion of grand jury reports and a related document, namely, the presentment.[7]
The grand jury is an institution with deep historical roots. See, e.g. , Costello v. United States, 350 U.S. 359, 362, 76 S.Ct. 406, 408, 100 L.Ed. 397 (1956) ("The grand jury is an English institution, brought to this country by the early colonists and incorporated in the Constitution by the Founders."); In re Report & Rec. of June 5, 1972 Grand Jury, 370 F.Supp. 1219, 1222 (D.D.C. 1974) ("By virtue of the Fifth Amendment, grand jury prerogatives were given institutional status in the United States, and grand juries have ever since played a fundamental role in our criminal justice system."). The operation of grand juries in a unique, non-adversarial, secret environment -- where qualitative rules pertaining to the consideration of evidence do not apply and witnesses are not subject to cross-examination -- offers substantial advantages in terms of the gathering and review of information. See Costello, 350 U.S. at 364, 76 S.Ct. at 409 (explaining, with reference to "the whole history of the grand jury institution," that "laymen conduct *569 their inquiries unfettered by technical rules").
But these features also implicate concomitant limitations. As related by a federal district court:
The need for safeguards on the grand jury is enhanced by the fact that it is not bound by the rules of evidence that normally protect the publicly accused from baseless or unduly prejudicial information. The grand jury can hear any rumor, tip, hearsay, or innuendo it wishes, in secret, with no opportunity for cross-examination. Costello v. U.S., 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397 (1956). The grand jury is not required to hear or consider evidence which would exonerate a target of an investigation, and the fairness of its methods is unreviewable. U.S. v. Williams, 504 U.S. 36, 112 S.Ct. 1735, 118 L.Ed. 2d 352 (1992).
In re Grand Jury Proceedings, Special Grand Jury 89-2, 813 F.Supp. 1451, 1463 (D. Colo. 1993) ; accord Simpson v. Langston, 281 Ark. 458, 664 S.W.2d 872, 873 (1984) ; Fabiano v. Palos Hills, 336 Ill.App.3d 635, 271 Ill.Dec. 40, 784 N.E.2d 258, 276 (2002) ("The absence of cross-examination and the nonadversarial nature of grand jury proceedings increase the risk that false testimony will go undetected[.]").[8]
Manifestly, secrecy will serve as a check on grand jury power, since, to the degree that the grand jury's influence is confined to the jury room, the potential for impact on reputational rights is constrained. See Special Grand Jury 89-2, 813 F.Supp. at 1464. Nevertheless, the General Assembly has authorized Pennsylvania investigating grand juries to issue public reports. See 42 Pa.C.S. § 4552. Moreover, such reports -- like the institution of the grand jury itself -- have a long lineage. See, e.g. , Biglieri v. Washoe Cty. Grand Jury Report, 95 Nev. 696, 601 P.2d 703, 705 (1979) ("The reportorial function of the grand jury, serving to enlighten the community on matters of public importance, occupies an important position in our democratic form of government.").
Significantly, however, courts draw a sharp distinction between grand jury reports that speak generally to public affairs and those that impugn named persons. Compare Ex Parte Faulkner, 221 Ark. 37, 251 S.W.2d 822, 823 (1952) ("So long as grand jury reports relate to general conditions affecting the public welfare and without reflecting specifically upon the character, or censuring the conduct, of individual citizens they serve a wholesome purpose and are frequently followed by beneficial results to the community."), with Application of United Elec. Radio & Mach. Workers of Am., 111 F.Supp. 858, 867 (S.D.N.Y. 1953) ("[A] man should not be subject to a quasi-official accusation of misconduct which he cannot answer in an authoritative forum.").[9] In this regard, substantial controversy *570 arises when the reporting function is directed toward targeted condemnation. See, e.g. , Thompson v. Macon-Bibb Cty. Hosp. Auth. , 246 Ga. 777, 273 S.E.2d 19, 21 (1980) ("Although there are important even compelling reasons for allowing a grand jury to bring the misconduct and malfeasance of specific public officials to light, this beneficial aspect of grand jury reporting must give way to the need for due process and fairness to the individual.");[10] Brooks v. Binderup , 39 Cal. App. 4th 1287, 1292, 46 Cal.Rptr.2d 501 (1995) ("[C]ourts and commentators have long recognized the vulnerability of unindicted individuals who are openly criticized in grand jury reports.").[11]
In New York, before the advent there of statutory procedural safeguards, including the right of criticized persons to appear before a grand jury, see N.Y. CRIM. PROC. L. § 190.85, the appellate courts displayed a particular hostility towards grand jury reports and presentments. For example, in People v. McCabe, 148 Misc. 330, 266 N.Y.S. 363 (N.Y. Sup. Ct. 1933), the court opined:
A presentment is a foul blow. It wins the importance of a judicial document; yet it lacks its principal attributes -- the right to answer and to appeal. It accuses but furnishes no forum for a denial. No one knows upon what evidence the findings are based. An indictment may be challenged -- even defeated. The presentment is immune. It is like the "hit and run" motorist. Before application can be made to suppress it, it is the subject of public gossip. The damage is done. The injury it may unjustly inflict may never be healed.
Id. at 367 ;[12] accord Davis, 257 So.2d at 886-88. See generally In re North, 16 F.3d 1234, 1239 (D.C. Cir. 1994) ("[V]arious courts have struck down with strong language efforts by grand juries to accuse persons of crime while affording them no forum in which to vindicate themselves[.]" (citations and internal quotations omitted) ).[13]
The core concern of the courts has been with the protection of reputational rights. The Supreme Court of Minnesota has offered the following perspective about the *571 potential harm to those rights that may be inflicted by a grand jury report:
The judicial imprimatur under which a grand jury operates gives to its pronouncements a ring of proven truth which they may not deserve. A formal indictment, supported by probable cause, is followed by a public trial during which a whole range of constitutional provisions insure a fair hearing for the accused. An informal report, on the other hand, drafted after a secret investigation and based on an uncertain standard of proof, may be remembered long after equally informal denials or objections forthcoming from its targets are forgotten. And the report's readers may understandably but incorrectly assume that at least the rudiments of due process notice and opportunity to be heard were afforded the accused.
In re Grand Jury of Hennepin Cty. , 271 N.W.2d 817, 819 (Minn. 1978).[14]
There is no challenge presently before this Court to the release of Report 1 at large, nor are we presented with a pure facial constitutional challenge to the provisions of the Investigating Grand Jury Act authorizing the public release of grand jury reports. More narrowly, the arguments presently under review seek an opportunity on Appellants' part -- as members of the Roman Catholic clergy accused by the grand jury of reprehensible conduct -- to participate in an evidentiary hearing prior to the release of the report.[15] If they can satisfy the supervising judge that the grand jury's findings are unsupported by a preponderance of the evidence (subsuming an accounting for evidence adduced at the hearing), Appellants ask that unsupported, false, and/or misleading findings be excised from the report prior to its release to the public, in order that their reputations might be preserved. See, e.g., Brief for Appellants at 27, 56-57 (positing that "the Report is riddled with clear errors and improper, misleading, and unreliable accusations and conclusions" and that they should have some chance to demonstrate this before the report is released publicly). In other words, Appellants request a pre-deprivation hearing as a manifestation of fundamental due process and fair play.
III. Pre-Deprivation Process
The Commonwealth opposes the affordance of any additional process. Its submissions do not recognize the concerns expressed by the courts and commentators as discussed in Part II, above. According to the Commonwealth, the "right of [written] response" on the part of individuals *572 criticized in a grand jury report will be universally sufficient to adequately protect their reputational interests as against condemnatory findings and satisfy due process norms. Brief for Appellee at 6; see also id. at 5 ("The Grand Jury Act provides protection against allegedly unfair statements in a report not by suppressing them, as petitioners demand, but by allowing both sides to speak.").[16]
The Commonwealth posits, on the one hand, that the grand jury system serves to "give an unfiltered voice to the people."Id. at 12. Nevertheless, the Commonwealth separately downplays the impact of Report 1 and assures its judicious reception by the public, as follows:
The report is not a judicial adjudication of wrongdoing, but rather the opinion of lay jurors. The public at large presumably understands that opinions may be wrong, just as accusations in a civil complaint (which is filed in court, and may be disseminated by news media) are understood to be partisan averments that are potentially false.
Brief for Appellee at 18.
Notably, in the following passage taken from its brief, the Commonwealth appears to display an appreciation that a grand jury report will directly impact Appellants' fundamental reputational rights:
Grand jury reports do not initiate legal proceedings or deprive individuals of life, liberty, or property; instead they raise issues that the jurors, as representatives of their community, believe the public needs to consider. Sometimes, there is simply no way to do that without saying things that may affect the reputations of certain individuals.
Brief for Appellee at 6 (emphasis added).[17] Along these lines, the Commonwealth acknowledges that grand jury reports -- not only as they pertain to general conditions affecting public welfare, but also insofar as they may impugn the reputations of specific persons -- will yield critical judgments by the citizenry.[18]
Although we agree with the Commonwealth that Report 1 will likely impact Appellants' reputations, we differ with the government's position in other material respects. First, the right of citizens to security in their reputations is not some lesser-order precept. See supra note 17. Rather, in Pennsylvania it is a fundamental constitutional entitlement. See *573 PA. CONST. art. I, § 1 ; R. v. DPW, 535 Pa. at 454, 636 A.2d at 149. The right is established in the opening passage of the Pennsylvania Constitution's Declaration of Rights -- under the title "Inherent rights of mankind" -- and is couched as an "indefeasible" guarantee. PA. CONST. art. I, § 1. This foundational assurance of reputational security has remained substantively extant through four iterations of the state charter, dating back to our Constitution of 1790.
This Court has recently stated that the Pennsylvania Constitution "places reputational interests on the highest plane, that is, on the same level as those pertaining to life, liberty, and property." Am. Future Sys., Inc. , 592 Pa. at 77 n.7, 923 A.2d at 395 n.7 (emphasis added); see also Driscoll v. Corbett , 620 Pa. 494, 514, 69 A.3d 197, 210 (2013) (observing that life, liberty, property, and reputation are all listed together by the state charter as "foundational freedoms").[19]
In the context of such fundamental rights, the historical acceptance of the institution of the grand jury can go only so far in justifying the relaxation of procedural requirements for the protection of those rights.
Second, our view aligns with those of the courts and commentators which have rejected the Commonwealth's premise that a state-sanctioned, judicially-supervised grand jury stands on equal footing, in terms of public perception, with individuals whom the grand jury may see fit to criticize. See supra Part II & note 14. Thus, we believe that the risk that the grand jury's pronouncements will be seen as carrying the weight of governmental and judicial authority -- and as themselves embodying the voice of the community relative to particular findings -- is substantial. See id. ; cf. Brief for Appellants at 30-31 (characterizing the "right of [written] response" highlighted by the Commonwealth as a "token opportunity to respond in a way that has no possibility of changing the outcome [and] is not due process worth the name"). In this regard, we conclude that the lines between a grand jury "investigation" and an "adjudication" are blurred when the grand jury renders wide-scale, individualized, condemnatory findings on the order of those announced in Report 1.
Third, responding to the Commonwealth's analogy between a grand jury report in the nature of Report 1 and a civil complaint, we observe that the differences are profound. The complaint contains allegations, not findings by a governmentally sanctioned body operating within the judicial sphere, upon its review of an extensive body of evidence. Moreover, the averments in a civil complaint, unlike the findings in a grand jury report, are subject to subsequent testing in the adjudicative process. In this respect and more broadly, all of the *574 points made by courts distinguishing indictments from presentments and reports are pertinent. See supra Part II.
Fourth, and consistent with Part II of this opinion, we distinguish between a grand jury report that is designed to address general welfare concerns, but may have a collateral impact on reputational rights, and a report -- such as Report 1 -- in which a primary objective is to publicly censure the conduct of specific individuals. See Report 1, at 2 (setting out to "shine a light on [the] conduct," of named "predator priests"). With the assistance of its legal advisor, the attorney for the Commonwealth, a grand jury setting about the latter course should apprehend that increased procedural protections are implicated in the interest of fundamental fairness.
Indeed, it is difficult to understand why an attorney for the Commonwealth would not wish to present such testimony from living individuals, for the benefit of lay grand jurors who have plainly set out to find the truth and reveal it to the public. Cf. Pa.R.P.C. 3.8, Explanatory Comment (observing that prosecutors have "the responsibility of a minister of justice and not simply that of an advocate"). When, in unusual circumstances, reputations must be compromised by grand juries on the order of the pervasive condemnations embodied in Report 1, see Brief for Appellee at 6 ("Sometimes, there is simply no [other] way ..."), we find that enhanced procedural protections are plainly required. And notably, the Investigating Grand Jury Act does not restrain the attorney for the Commonwealth from implementing additional procedural protections, when a grand jury undertakes to prepare a report of the tenor and scale of Report 1.
Fifth, the procedural protections provided in the Investigating Grand Jury Act are minimal relative to Report 1. As we have otherwise related, we conclude that the "right of [written] response" -- entailing the opportunity to possibly append a hearsay rebuttal statement to a 900-page report otherwise impugning an individual as a sexual predator or facilitator alongside more than 300 others amidst the hierarchy of a religious institution -- is not sufficiently effective. Significantly, as well, there can be no doubt that the subject matter of the report is incendiary, and therefore, the stakes for individuals reproached therein are substantially heightened.
Furthermore, the supervising judge's statutory preponderance-based review may be inadequate, in the grand jury setting, to serve as a sufficient protective measure. "Preponderance" means the greater weight of the evidence, or evidence that "tips the scales" toward belief. Commonwealth v. Brown, 567 Pa. 272, 284, 786 A.2d 961, 968 (2001). The application of this standard is best suited to adversarial proceedings where competing litigants present evidence to be weighed by a factfinder -- indeed, the preponderance of the evidence is the general standard upon which most civil matters are resolved. See, e.g. , Sutliff v. Sutliff, 518 Pa. 378, 385, 543 A.2d 534, 538 (1988).
Unfortunately, there is the risk that the standard can be too effortlessly satisfied in the grand jury setting, where the evidence is controlled by a single presenter -- the attorney for the Commonwealth -- free from any requirement to adduce legally competent evidence,[20] or exculpatory proofs. See supra Part II (discussing inherent limitations associated with the *575 grand jury regime). Such freedoms may enhance the internal functionality of grand juries, but we reiterate that they also represent a limitation upon its truth-finding capabilities. See id.
Moreover, from all appearances, the supervising judge may have performed his preponderance-of-the-evidence review on a report-wide basis, rather than discretely determining if the grand jurors' specific criticism of each individual appellant was supported by a preponderance of the evidence. See June 5 Opinion, at 5. But that procedure for judicial review can afford no assurance of any protection for individual reputational rights, when the safeguard can be overwhelmed by the tenor and scale of a grand jury report such as Report 1.[21]
For these reasons, we find that preponderance-of-the-evidence review by a supervising judge, as provided in the Investigating Grand Jury Act, is not a sufficient safeguard to obviate the necessity to provide Appellants an opportunity to respond to the grand jury's criticisms in a meaningful way.
Finally, replying to the Commonwealth's position that the Investigating Grand Jury Act leaves no room for pre-deprivation processes above and beyond what are provided in the enactment, we observe that that the statute is subordinate to the Constitution. See, e.g. , In re Subpoena on Judicial Inquiry & Review Bd., 512 Pa. 496, 507, 517 A.2d 949, 955 (1986) ("In the framework of our governmental system it is clear that the constitutional rule of law is more fundamental and must prevail."). To the extent that the minimal procedures explicitly provided by the enactment are insufficient to protect Appellants' fundamental constitutional rights, the statute might be deemed unconstitutional as applied.[22] Thus, the question becomes whether the statute may be interpreted as affording sufficient process, consistent with its design, or at least as not foreclosing a remedial pre-deprivation process. See 1 Pa.C.S. § 1922(3) (embodying the presumption "[t]hat the General Assembly does not intend to violate the Constitution of the United States or of this Commonwealth"). And, accordingly, Appellants' argument regarding the availability of additional pre-deprivation process, which satisfies the constitutional requirement of due process, must be considered by the Court, if the portions of the report critical of their conduct ultimately are to be released to the public.[23]
*576 IV. The Availability and Nature of the Additional Process
Despite the existence of a majority consensus in the above respects, Justices are not of one mind, at this juncture, concerning what process-related remedial measures can be taken now -- or if any such measures would be sufficient now to comport with due process norms -- to justify the release of the specific criticisms pertaining to Appellants. Further, the Court has determined that it would benefit from oral argument in considering this question. Accordingly, the matter will be calendared for oral argument at the Court's forthcoming session in September 2018, in Philadelphia. We emphasize that a process for publication of an interim grand jury report -- subject to temporary redactions necessary to protect Appellants' reputational interests at least until they have been afforded adequate process -- has been initiated by our present Order in the meantime. See infra Part VIII.
V. The Remedy of Excision
While the Court remains divided concerning the availability and/or scope of a pre-deprivation process, a consensus also pertains as to another remedial aspect. Specifically, this Court has determined that the remedy of excision is available with respect to a grand jury report that offends due process, or otherwise unconstitutionally impairs reputational rights, relative to a particular individual or individuals.
Although the remedy of excising discrete, false or unsupported information from a 900-page report might seem relatively straightforward, the Commonwealth opposes it. Despite the grand jury's vigorous entreaty that its findings should be made public, the Commonwealth contends that, if there is a defect in the report implicated by Appellants' challenges, the entire document must be suppressed. See, e.g. , Brief for Appellee at 5 ("If the responses persuade the supervising judge that, in fact, the report is not supported by a preponderance of the evidence, he must reject the report[.]").[24] Along these lines, the Commonwealth provides an extensive criticism of judicial "rewriting" of grand jury reports. Id. at 7.
The Commonwealth's all-or-nothing approach undermines the earnestly-expressed wishes of the grand jury which it empaneled. See Report 1, at 1 ("We, the members of this grand jury, need you to hear this."). It would be ideal if the grand jury remained in session, so that a broader panoply of remedies would be available to us. And it would be preferable for the grand jury to have an opportunity to correct mistakes that it may have made, if any.
But the grand jury's term has expired. And we have little doubt -- upon our review of the grand jurors' explicit wishes inscribed in Report 1 -- that those jurors would prefer for any mistakes to be eliminated upon culmination of all necessary process (if any remedial pre-deprivation process can be found to be sufficient), over *577 suppression of their entire findings, explanations, and recommendations. Accord Carlacci v. Mazaleski , 568 Pa. 471, 477-78, 798 A.2d 186, 190 (2002) (holding that, although there was no statutory right to expungement of Protection From Abuse Act records, there was a due process right to such expungement, given the potential reputational harm of the extant records).[25]
VI. Temporary Redaction and Public Release of an Interim Grand Jury Report
Returning to the matter of temporary redactions, the approach of publicly releasing an interim grand jury report with such redactions was proposed by the group of news organizations presenting themselves as Media lntervenors.[26] In directing the preparation of such a report in the accompanying Order, see infra Part VIII, we emphasize that we have employed a due-process-based protocol affording Appellants -- and all others with challenges to the grand jury report pending in other cases -- the opportunity to voice discrete objections. We have also decided to utilize the services of a special master, who will be appointed via separate order, to adjudicate any associated controversies. In this way, the Court will continue to proceed with the unwavering objective that fairness must be consistently administered to all parties in the context of grand jury reports, as is the case otherwise in the process of orderly judicial review.
Individual Justices have expressed deep concern for ensuring the continued protection of the petitioner-appellants' reputational rights until the matter of a remedy is decided. Accordingly, we take this opportunity to stress the importance of fashioning the temporary redactions to effectively safeguard those interests. For example, the Commonwealth should not substitute initials for names, since this approach obviously could suggest an association between material in the report and a case caption employing a petitioner-appellant's initials, thus potentially giving rise to public speculation concerning identity. Indeed, no substitute references of any kind should be inserted into the report. Rather, some technique must be applied to temporarily mask all content which might give rise to an association between an appellant and discrete material in the report. In this respect and more broadly, the Commonwealth must employ all reasonably available measures to prevent the identification of the petitioner-appellants via either specific or contextual references in the report.
The petitioner-appellants, on the other hand, must appreciate that, in addition to safeguarding their rights, it is also this *578 Court's present aim to make the bulk of Report 1 available to the public as soon as possible. Accordingly, they are advised that they may not assert objections to generalized content of the report simply because it may pertain to them. For example, with regard to Report 1's depiction of more than 300 clergymen as "predator priests," this assertion will not be suppressed on the basis that a particular appellant has been named as being among the 300.
In all events, our governing purpose should be very clear by this point, and we trust that a special master will serve ably to resolve any residual disputes.
VII. Conclusion
Under the Declaration of Rights set forth in the Pennsylvania Constitution, individuals enjoy the fundamental right to the protection of their reputations. That right cannot be impaired by governmental actors -- or those operating under governmental authority -- absent the affordance of due process of law to affected individuals. Due process is measured in terms of a meaningful opportunity to be heard, encompassing participation at a time when it will be meaningful.
The 40th Statewide Investigating Grand Jury undertook the salutary task of exposing alleged child sexual abuse and concealment of such abuse, on an extraordinarily large scale, which the grand jurors have pronounced was perpetrated by trusted members of a religious institution. Thus, the grand jury submitted a report for publication specifically finding that more than 300 people, identified by name, committed criminal and/or morally reprehensible conduct. Ideally, living persons so identified would have been afforded the opportunity to appear before the grand jury and to respond, in some reasonable fashion, to the grand jury's concerns. For those among the present challengers who were denied such opportunity, and who otherwise have submitted proper appeals seeking the remedy of a pre-deprivation hearing, we hold that they are entitled to this Court's further consideration of whether additional process can and should now be provided as a curative measure.
VIII. Order
The Application to Intervene at 106 WM 2018 is granted, to the extent that the Media Intervenors are afforded provisional intervention status for the limited purpose of considering the merits of the Application for Public Access that they have filed with this Court. See Commonwealth v. Fenstermaker, 515 Pa. 501, 504 n.1, 530 A.2d 414, 416 n.1 (1987).
With respect to the Application for Public Access, the Court grants the Media Intervenors' alternative request for Report 1 of the 40th Statewide Investigating Grand Jury to be temporarily redacted to permit public dissemination of an interim version of the report pending further resolution of the challenges before the Court. The Commonwealth is directed to prepare a redacted version of Report 1, which removes specific and contextual references to any petitioner who has an appellate challenge pending before this Court, including cases not listed in the present caption, in a fashion that is consistent with the letter and spirit of the above Opinion (the "Interim Report"). The Commonwealth is further directed to append responses accepted by the supervising judge from all individuals and entities allowed to do so, but which have not filed appeals with this Court (the "Responses").
It is noted that the present version of the report already contains redactions per which the grand jury itself omitted identifying information from documentary materials inserted into the report, primarily *579 concerning victims and witnesses. As such, in the Interim Report, the Commonwealth shall identify all temporary redactions made pursuant to this Order with the notation "REDACTED -- ONGOING APPELLATE LITIGATION." The Commonwealth shall complete this redaction process on or before August 3, 2018, at 2:00 p.m.
Subsequently, the Commonwealth shall immediately serve the Interim Report and the Responses -- which will remain subject to grand jury secrecy pending completion of the process prescribed here -- on all petitioners whose appellate challenges are presently pending in this Court (including in matters that are not the direct subject of this Opinion and Order). Simultaneously, the Commonwealth shall provide a copy of the Interim Report and the Responses to the special master, who will be designated by separate order.
By 1:00 p.m. on August 7, 2018, the petitioners with appeals pending in this Court may submit to the special master any challenges to the redactions. Those challenges shall be limited to identifying with particularity any errors in redaction, with the objecting petitioner identifying precisely what individual-specific information regarding the petitioner remains in the Interim Report and the Responses.
If no challenges are presented with regard to the redaction process, the special master shall publicly release the Interim Report and Responses no later than 2:00 p.m. on August 8, 2018.
If timely challenges to the redaction process are submitted, the special master shall promptly resolve all such challenges, making any necessary additional redactions. The special master shall publicly release the Interim Report and the Responses no later than 2:00 p.m. on August 14, 2018.
Requests for alterations to this schedule will not be entertained from the parties, and no extensions will be granted at their request. The parties are cautioned against provoking or instigating unnecessary ancillary litigation regarding the production of the Interim Report.
In all other respects, the Media Intervenors' Application for Public Access is denied.
The Prothonotary is directed to schedule the appeals at 75, 77-82, 84, and 86-89 WM 2018 for oral argument in Philadelphia.
Justices Todd, Donohue, Dougherty, Wecht and Mundy join the opinion.
Justice Baer joins Parts I, II and IV-VIII of the majority opinion, concurs in the result as to Part III and files a concurring opinion.

Act of Oct. 5, 1980, P.L. 693, No. 142, § 216(a)(2) (as amended 42 Pa.C.S. §§ 4541 -4553 ).

In order to provide appropriate context, this opinion reveals some information that would otherwise be subject to grand jury secrecy. The supervising judge has signaled his approval of the release of this information (along with the balance of Report 1), and the publication of the content that we provide is not contested by the petitioner-appellants, whose efforts focus on the suppression of information from the report that is specific to them personally.

The questions of manner and scope are significant, because the litigants present divergent views concerning the requirements of the Investigating Grand Jury Act pertaining to a supervising judge's preponderance findings. These matters are touched upon in Part III of this opinion, and we anticipate returning to them in greater detail at a later time.

The supervising judge incorrectly indicated that the statutory provisions pertaining to notice and an opportunity to respond are mandatory when, in fact, they turn on a supervising judge's exercise of "his sole discretion." 42 Pa.C.S. § 4552(e). In the present appellate proceedings, the Commonwealth, at times, perpetuates this mistake. See, e.g., Brief for Appellee at 6 ("The statutory framework accounts for [the due process] concern through the pre-publication right of response." (emphasis added) ).

The supervising judge also noted that all current Bishops for the relevant dioceses were afforded the opportunity to testify before the grand jury, and one bishop did testify, while five others filed written statements. See id. at 5.

Those filings presently remain under seal and are mentioned here to provide context. Disclosure of the fact of the filing does not impair grand jury secrecy or the petitioner-appellants' rights in any fashion.

Although there are variations among jurisdictions concerning the character of presentments, they are generally criminal accusations initiated by a grand jury, as opposed to accusations advanced by a prosecutor. See Black's Law Dictionary 1184 (6th ed. 1990). In Pennsylvania, the filing of presentments is expressly authorized by the Investigating Grand Jury Act. See 42 Pa.C.S. § 4551.

See generally Wayne R. LaFave, Jerold H. Israel, Nancy J. King & Orin S. Kerr, 4 Crim. Proc. § 15.3(a) (4th ed. 2017) (observing that the structure of grand jury screening "asks a group of laypersons to apply an unfamiliar legal standard to a onesided case, presented in a process that is non-adversary, that allows the prosecutor to establish a close rapport with the jurors, and that forces the jurors to rely largely on the prosecutor's investigative resources and legal advice").

Commentators have observed that some of the strongest judicial expressions of concern about the fairness of the reporting function of grand juries were written during the McCarthy era. See, e.g., Barry Jeffrey Stern, Revealing Misconduct by Public Officials through Grand Jury Reports , 136 U. Pa. L. Rev. 73, 77 n.1 0 (1987) (citing 1 Sara Sun Beale & William C. Bryson, Grand Jury Law and Practice § 3:03 (1986) ). The United Electrical, Radio & Machine Workers of America decision is recognized as a leading case in this respect. See id.

The Thompson case is couched in terms of criticisms of government officials, since public office, along with the subject of organized crime, is an arena in which grand jury reports most often have been authorized.

See generally Richard H. Kuh, The Grand Jury "Presentment": Foul Blow or Fair Play? , 55 Colum. L. Rev . 1103, 1103, 1126 (1955) (positing that grand jury presentments and reports exist "in the shadow of illegality" and discussing "fair play" procedural safeguards to protect individual rights).

In terms of the "foul blow" rubric, some courts have found presentments and reports to be distinguishable only in that reports are "governed by standards which aim to soften foul blows." Special Grand Jury 89-2, 813 F.Supp. at 1463. Notably, the sufficiency of the standards by which this softening occurs in Pennsylvania is a critical consideration at issue in the present cases, as discussed below. See infra Part III.

These lines of criticism have led to the general disfavoring of presentments and reports in the federal system as a means of revealing wrongdoing, see Special Grand Jury 89-2 , 813 F.Supp. at 1462-63, although there are some circumstances under which they persist. See, e.g. , 18 U.S.C. § 3333 (pertaining to a special grand jury report relating to organized criminal activity). Significantly, however, in the limited circumstances in which federal special grand jury reports remain, no individual may be named in the report without first being afforded the opportunity to appear before the grand jury. See Dep't of Justice, Crim. Res. Man. § 159, available at https://www.justice.gov/usam/criminal-resource-manual-159-reports-special-grand-juries (last viewed July 16, 2018).

Accord Simpson, 664 S.W.2d at 873 ("The report is a state publication which carries the aura of approval by the judge who accepted it."); Petition of Davis, 257 So.2d at 888 ("The statement of a grand jury demands respect within a community and its deliberations and conclusions are tantamount to fact in the eyes of the populace."); Wood v. Hughes, 9 N.Y.2d 144, 212 N.Y.S.2d 33, 173 N.E.2d 21, 26 (1961) (upon consideration of the grand jury as a "judicial body occupying a position of respect and importance in the community," depicting the potential for harm from an accusatory grand jury report as "incalculable"); Simington v. Shimp, 60 Ohio App.2d 402, 398 N.E.2d 812, 816 (1978) (expressing the view that, on account of "the public's belief that the grand jury speaks with judicial authority[,] ... any attempt by a named individual to rebut the contents of [a grand jury] report would not have, in the public's mind, the same 'official weight' as the report's original accusation").

Appellants suggest that, ideally, criticized persons would be afforded an opportunity to appear before the grand jury contemplating a report, as is explicitly mandatory in the federal system and in some other jurisdictions. See, e.g., supra note 13; N.Y. Crim. Proc. L. § 190.85. Relative to Report 1, however, this opportunity is foreclosed, since the tenure of the 40th Statewide Investigating Grand Jury has expired.

As previously noted, this "right of [written] response" is not couched in the Investigating Grand Jury Act as a "right," but rather, is directed to the "sole discretion" of a supervising judge. 42 Pa.C.S. § 4552(e) ; seesupra note 4.

In this passage, the Commonwealth also implies that reputational rights are of a lower order than life, liberty, and property. Contra Am. Future Sys., Inc. v. Better Bus. Bureau of E. Pa., 592 Pa. 66, 77 n.7, 923 A.2d 389, 395 n.7 (2007).

See Brief for Appellee at 14 ("The grand jury reports its findings by issuing its report; objectors tell their side by attaching responses to the document. Both are published simultaneously; the public is then free to decide. " (emphasis added) ); id. at 5 (portraying the public as "the real decision-maker"); id. at 8 ("The report stands. The public should see it and decide for itself.").
The Commonwealth also appears to regard the affordance of additional process to criticized persons, and the ability of those persons to submit written responses for the public's review, as mutually exclusive procedures. See Brief for Appellee at 21. However, the Commonwealth has offered no supporting reasons why that might be so. Additionally, we reject the notion that fairness-based enhancements -- to a non-adjudicative truth-finding process conducted on the terms of a grand jury investigation, see supra Part II -- should foreclose the affordance of an opportunity of individuals to respond to critical findings directed to their conduct, per the relevant provisions of the Investigating Grand Jury Act. See 42 Pa.C.S. § 4552(e).

At one time, federal constitutional law appeared to be in alignment. See Wisconsin v. Constantineau, 400 U.S. 433, 437, 91 S.Ct. 507, 510, 27 L.Ed.2d 515 (1971) ("Where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential."). In Paul v. Davis, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976), however, the Supreme Court downgraded reputational interests as a matter of federal constitutional law. See id. at 701, 96 S.Ct. at 1160-61.
Notably, as well, the federal courts exercise less stringent supervision over grand juries than is required in Pennsylvania. Compare United States v. Williams, 504 U.S. 36, 48, 112 S.Ct. 1735, 1742, 118 L.Ed.2d 352 (1992) (discussing federal grand juries' "functional independence" from the judicial branch), with In re Dauphin Cty. Fourth Investigating Grand Jury, 610 Pa. 296, 318, 19 A.3d 491, 503 (2011) ("The very power of the grand jury, and the secrecy in which it must operate, call for a strong judicial hand in supervising the proceedings.").

By "legally competent evidence," we mean evidence that would be admissible in a court of law in a contested, adversarial proceeding.

For instance, in the context of Report 1, application of the preponderance standard on a report-wide basis would allow that the report could be false or inaccurate relative to a minority of criticized individuals, as long as it was true respecting the majority of them. The notion that the Legislature would have intended for the judicial review to proceed in such an arbitrary fashion -- relative to the constitutionally protected reputational rights of all individuals -- is manifestly unreasonable.
As previously noted, the Court intends to provide further guidance about preponderance review, by supervising judges, attendant to its ongoing review. See supra note 3.

Again, we clarify that our use of the term "minimal" means minimal in the specific context of a report in the nature, and of the scale, of Report 1.

The above analysis subsumes consideration of the Mathews factors. See Mathews, 424 U.S. at 335, 96 S.Ct. at 903. Specifically, we find that: the private interest affected by Report 1 is a fundamental one equivalent to life, liberty, and property; the risk of an erroneous deprivation is substantial in light of the inherent limitations of the grand jury system; and the administrative burden in providing some additional process is not too great to obviate the requirement.
Parenthetically, although many of the claims presented by challengers to Report 1 have been couched in terms of the due process provisions of the Pennsylvania Constitution, we note that the analogous provisions of the federal Constitution establish a minimum floor for the protection due under the state charter. See, e.g. , Commonwealth v. Arter, 637 Pa. 541, 551, 151 A.3d 149, 156 (2016) (citations omitted). Accordingly, the Mathews factors are directly pertinent across the range of constitutional due process claims under consideration here.

To be fair, in this passage from its brief, perhaps the Commonwealth contemplates application of preponderance review solely on a report-wide basis. We have previously explained, however, the insufficiency of such review in the context of a report containing findings of criminal and/or reprehensible conduct on the part of hundreds of persons. See supra Parts II & III & n.21.

See also In re Grand Jury Proceedings, Special Grand Jury 89-2 , No. 92-Y-180, slip op. , 1993 WL 245557, at *3 (D. Colo. Jan. 26, 1993) (directing a release to the public of a redacted grand jury report); Brief for Appellants at 29-30 ("It cannot possibly be, and is not the law in this Commonwealth, that a Supervising Judge is powerless to correct manifest error, no matter how serious or how violative of fundamental constitutional protections the errors may be."). See generally Beale, et al. , Grand Jury L. & Prac. § 2:5 ("The only complete and fully satisfactory remedy for the subject of an improper grand jury report is the suppression of all objectionable portions of the report before it is released to the public.").

The Media Intervenors will be afforded provisional intervention status for the limited purpose of considering the merits of an "Application for Public Access" that they have filed with this Court. See Commonwealth v. Fenstermaker, 515 Pa. 501, 504 n.1, 530 A.2d 414, 416 n.1 (1987).
We acknowledge that the Media Intervenors' request for an interim report was posed in the alternative, as their main plea is for the Court to authorize the public release of Report 1 in its entirety.